UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SCOTT D. REDMOND,

       Plaintiff,

    v.

NANCY BERRYHILL,

       Defendant.

Case No.  17-cv-01603-DMR

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 21, 23

Plaintiff Scott D. Redmond ("Redmond") moves for summary judgment to reverse the Commissioner of the Social Security Administration's (the "Commissioner's") final administrative decision, which found that Redmond was not disabled and therefore denied his application for benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq*. The Commissioner cross-moves to affirm. For the reasons stated below, the court grants the Commissioner's cross-motion and denies Redmond's motion.

## I.    PROCEDURAL HISTORY

On December 12, 2012, Redmond filed an application for Social Security Disability Insurance (SSDI) benefits pursuant to Title II of the Social Security Act, 42 U.S.C. § 401 *et seq*., alleging that he had various mental and physical disabling conditions including neurological poisoning, shoulder damage, and eye failure. Administrative Record ("AR") 444-50. His Title II application was initially denied on March 26, 2013, and again on reconsideration on June 4, 2013. AR 451-53 (Initial Denial), 456-58 (Reconsideration). He then filed a timely request for hearing before an Administrative Law Judge ("ALJ"). AR 462-64.

Meanwhile, on November 25, 2013, Redmond protectively filed an application for Supplemental Security Income benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq*., alleging disability beginning on April 4, 2010. AR 168-76. His Title XVI

application was initially denied on April 7, 2014, and again on reconsideration on April 25, 2014. AR 97-101 (Initial Denial), 102-04 (Reconsideration). He then filed a timely request for hearing. AR 111.

ALJ David R. Mazzi held a hearing on the Title II and Title XVI applications on November 12, 2014. AR 32-67. The ALJ held the record open after the hearing to receive additional medical evidence, AR 327-29, 424-33, then issued a decision dismissing the Title II application and finding that Redmond was not disabled and therefore not eligible for supplemental social security income under Title XVI. AR 11-31. The Appeals Council denied Redmond's request for review on February 6, 2017. AR 1-5. The ALJ's decision therefore became the Commissioner's final decision. *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1231 (9th Cir. 2011).

Redmond filed suit in this court pursuant to 42 U.S.C. § 405(g). Since Redmond is not challenging the dismissal of his earlier-filed application for benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.*, his appeal focuses solely on the denial of the Title XVI application.

## II. THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents her from engaging in substantial gainful activity[1] and that is expected to result in death or to last for a continuous period of at least twelve months. *Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant incapable of performing the work she previously performed, as well as incapable of performing any other substantial gainful employment that exists in the national economy. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry. 20 C.F.R. §§ 404.1520, 416.920. The steps are as follows:

---

[1] Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit. 20 C.F.R. §§ 404.1510, 416.910.

United States District Court
Northern District of California

1.      At the first step, the ALJ considers the claimant's work activity, if any. If the claimant is doing substantial gainful activity, the ALJ will find that the claimant is not disabled.

2.      At the second step, the ALJ considers the medical severity of the claimant's impairment(s). If the claimant does not have a severe medically determinable physical or mental impairment that meets the duration requirement in [20 C.F.R.] § 416.909, or a combination of impairments that is severe and meets the duration requirement, the ALJ will find that the claimant is not disabled.

3.      At the third step, the ALJ also considers the medical severity of the claimant's impairment(s). If the claimant has an impairment(s) that meets or equals one of the listings in 20 C.F.R., Pt. 404, Subpt. P, App. 1 [the "Listings"] and meets the duration requirement, the ALJ will find that the claimant is disabled.

4.      At the fourth step, the ALJ considers an assessment of the claimant's residual functional capacity ("RFC") and the claimant's past relevant work. If the claimant can still do his or her past relevant work, the ALJ will find that the claimant is not disabled.

5.      At the fifth and last step, the ALJ considers the assessment of the claimant's RFC and age, education, and work experience to see if the claimant can make an adjustment to other work. If the claimant can make an adjustment to other work, the ALJ will find that the claimant is not disabled. If the claimant cannot make an adjustment to other work, the ALJ will find that the claimant is disabled.

20 C.F.R. § 416.920(a)(4); 20 C.F.R. §§ 404.1520; *Tackett*, 180 F.3d at 1098-99.

**III.    ISSUES PRESENTED**

Redmond's appeal presents two issues: 1) whether the ALJ erred in failing to fully develop the record regarding his mental impairments; and 2) whether the ALJ erred at Step 5 of the sequential evaluation process. Regarding the first issue, Redmond argues that his testimony demonstrated that his claim for toxic poisoning was based, in large part, on grandiose and delusional beliefs about alleged chemical exposure which have no support in the record. According to Redmond, the ALJ should have recognized that he was delusional, and ordered him to undergo a mental health exam or obtain testimony from a mental health expert in the face of

such obviously baseless testimony.  Regarding the second issue, Redmond contends that the ALJ erred in (1) finding that he could perform medium work and (2) failing to account for his shoulder impairments in the RFC.

The Commissioner cross-moves to affirm, asserting that Redmond waived the right to challenge the ALJ's alleged failure to fully develop the record on appeal.  The Commissioner further asserts that even if Redmond did not waive this issue, the ALJ did not err in failing to request further development of the record regarding his mental impairments.  The Commissioner also argues that the ALJ did not err at Step 5 and that his decision and findings were supported by substantial evidence.

## IV.    FACTUAL BACKGROUND

### A.    Plaintiff's Testimony

Redmond provided the following testimony at the November 12, 2014 hearing in response to questions from the ALJ, his attorney, and the vocational expert (VE).  Redmond last worked for Kaiser in 2010 as a research manager.  AR 45.  He was laid off because he had trouble driving long distances due to fatigue and migraines.  AR 47.  As a research manager, he had to drive cross country to all the Kaiser headquarters.  *Id.*  At first, he was able to drive 4-5 hours before his back and shoulders started hurting; later, he was not able to drive more than a couple of hours.  AR 47-48.  He was taking the following medications for migraines, sleeping problems, back and shoulder pain, anxiety and depression: Zolpidem (10 milligrams), Lorazepam (.5 milligrams); Alprazolam (.25 milligrams), Sumtriptan (25 to 50 milligrams) depending on the severity of his headaches; Rizatriptan; Fluoxetine; Vitamin B3; and Aspirin in different dosages depending on back and shoulder pain.  AR 48.  He was on a free health program and saw one doctor at Marin Community Clinics.  *Id.*

Redmond testified that he suffered from anxiety, and saw a psychiatrist every few months to make sure that he was not overmedicated.  AR 51.  He was not seeing a regular therapist to address anxiety.  *Id.*  In response to the question," How does the anxiety affect you and your ability to do things?," Redmond testified that he felt terrified because he had received death threats for providing testimony to federal agencies over his toxic/chemical poisoning:

1
2
3
> It's, you know, -- I mean, I have literal death threats, as you know. I've testified in a federal testimony, you know; talked to FBI, and GAO, and Senate investigation committee, on this toxic poisoning.

4
5
6
> One of my associates is now dead, Gary D. Conley. You can read about him in the paper. He claimed to have the similar kind of situation. So I literally fear for my life. I've been told, I've been threatened. I've been attacked, now, multiple times, because I gave this testimony.

7
8
9
10
> So that's very frightening. And I'm seeing these symptoms get worse and worse. And I -- you know, know of one guy who's missing and one guy who's dead. And that's -- you know, Larry Bird -- David Bird, from Wall Street Journal. FBI can literally not find him, and he was one of the people that my partner had been talking to, my associate had been talking to.
> So that's quite terrifying, but --

11 AR 52. He testified that he was reluctant to go outside, despite his doctors' advice to walk every

12 day. AR 52.

13 Regarding his shoulder, Redmond testified that his shoulders were dislocated by an

14 improperly set-up physical therapy machine, causing scar tissue to form. AR 54. As a result, both

15 shoulders bothered him, but the right shoulder was worse than the left. *Id*. If he lifted his right

16 shoulder too high or his shoulder was too low, or if he held it one position for a long time, he

17 would start experiencing pain. AR 55. He could type for about 10-15 minutes with his right hand

18 before he would have to stop using it for 1/2 hour to 45 minutes, during which time he would not

19 use it, let it hang down, or just lie down with his right hand next to him. *Id*. He was given daily

20 physical therapy exercises to prevent the formation of scar tissue in his shoulders. *Id*.

21 Redmond testified that due in part to his shoulder, he spent a "horrible amount," almost

22 half a day lying down. *Id*. This was "very frustrating" because: "If you've looked at my resume,

23 you know I -- I used to be one of the most productive people in the Bay Area. And this is just

24 killing me." AR 56.

25 In response to the VE's questions, Redmond testified that he worked as a vice president for

26 Energy Technology chemical company starting in November 2002. AR 61. Although unclear, it

27 appears that while working at this job, he came into contact with different chemicals and

28 developed toxic poisoning. AR 61-62. According to Redmond, at this time, he was working with

1   the U.S. Department of Energy in order to develop hydrogen energy and had to test different

2   chemicals and build a machine in which to store hydrogen.   AR 61.  For this work, he received a

3   congressional commendation, and a federal grant to build a laboratory in Rohnert Park and hire

4   engineers from companies such as Chevron to build machines to store hydrogen.  *Id.*

5          Redmond then worked as a vice president of Clever Industries chemical company from

6   February 2009 to August 2010.  AR 59.  As vice president, he was contracted to government

7   organizations and charity community service groups where he managed the construction of big

8   events such as the San Francisco Blues Festival for the National Park Service and the Bay to

9   Breakers race.  AR 59-60.

10          He worked for Kaiser from May 2010 to January 2011 as a researcher.  As a researcher, he

11  would conduct computer demonstrations of Kaiser's new doctor portal for senior Kaiser

12  executives and medical personnel.  AR 57.  He would then have the person use the portal on his or

13  her own.  *Id*.  Redmond would record their movements on a video, review and analyze the video,

14  and draft reports and Powerpoint presentations about doctor feedback regarding the portal.  *Id*.

15  His reports were sent to Kaiser's marketing, business programming, and design people.  *Id*.

16        **B.      The Testimony of Medical Expert Dr. Gerald Weingarten**

17          Dr. Weingarten testified that he could not opine on the effect of possible toxic poisoning

18  on Redmond's functional capacity because there was no objective evidence that his stated

19  symptoms were related to toxic poisoning.  AR 40.  Weingarten also testified that Redmond's only

20  possible functional limitation would be related to his shoulder, but that there was insufficient

21  information in the record about whether he was still experiencing shoulder problems.  AR 41.

22        **C.      The Testimony of Vocational Expert Joel Greenberg**

23          At the hearing, the VE categorized Redmond's past work history as follows: manager of

24  business development, DOT code 189.117-014, sedentary exertional level and a SVP[2] of 8;

25

26  [2]  "'SVP' refers to the 'specific vocational preparation' level which is defined in the DOT as 'the
    amount of lapsed time required by a typical worker to learn the techniques, acquire the
27  information, and develop the facility needed for average performance in a specific job-worker
    situation.'"  *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1230, n.4 (9th Cir. 2009)
28  (quoting Dictionary of Occupational Titles, Appendix C, p.1009 (4th ed. 1991)).  "'The DOT lists
    a specific vocational preparation (SVP) time for each described occupation. Using the skill level

construction superintendent, DOT code 182.167-26, light exertional level[3] and a SVP of 7;

consulting professional, DOT code 189.117-050, sedentary exertional level and a SVP of 8; vice

president, DOT code 189.117-034, sedentary exertional level and a SVP of 8; and office manager,

DOT code 169.167-034, sedentary exertional level and a SVP of 7.  AR 58, 60, 62-63.

Redmond's attorney posed the following hypothetical to the VE to determine how

Redmond's restrictions would affect an individual's ability to perform work: an individual of

Redmond's age, education, and prior work experience as described by the VE, who had to rest on

and off for 3-4 hours per day, and would be off task 3-4 hours out of an 8-hour workday due to

fatigue, migraines, other medical medications, despite the number of skills and previous work

experience this person might have.  AR 64.  The VE testified that an individual with such

restrictions would likely be unable to hold a job because that individual would likely be unable to

complete the task within the time restraints provided, unless the person's skills were so valuable

that 4 hours of that person's time was better than 8.  AR 65.

In response to questioning by the ALJ, the VE testified that there would be greater

likelihood of transferability of skills from prior work at an SVP level of 6 and higher to light or

sedentary jobs, unless the focus was on a specific industry which might require more vocational

adjustment to obtain skills and understanding of that particular industry.  AR 65-66.  According to

the VE, if the focus was not a specific industry, and on a more generalized work situation, then

there would be less of an adjustment period.  AR 66.

//

//

//

definitions in 20 C.F.R. 404.1568 and 416.968, unskilled work corresponds to an SVP of 1–2;
semi-skilled work corresponds to an SVP of 3–4; and skilled work corresponds to an SVP of 5–9
in the DOT.'"  *Bray*, 554 F.3d at 1230, n.4 (quoting Policy Interpretation Ruling: Titles II & Xvi:
Use of Vocational Expert & Vocational Specialist Evidence, & Other Reliable Occupational Info.
in Disability Decisions, SSR 00-4P (S.S.A. Dec. 4, 2000)).

[3] The VE testified that Redmond was likely performing this job at a heavy exertional level.  AR
61.

### D. Relevant Medical Evidence

#### 1. Mental Health

##### a. Treating Psychiatrist Roman Rodriguez, M.D. (February 2010 - September 2010)

Redmond saw Dr. Roman Rodriguez from February 2010 to September 2010 primarily for anxiety management.[4]  At his initial visit on February 24, 2010, Redmond reported a history of depression, consistent anxiety, and chronic sleep problems.  AR 340.  Upon a mental health status examination, Rodriguez observed that Redmond had non-psychotic thoughts, normal speech/language, above average intelligence, normal activity levels, and no movement disorders.  AR 338.  He also noted that Redmond was not homicidal or suicidal.  *Id.*  Based on the initial visit, Rodriguez diagnosed Redmond with Axis I[5] (Major Depression- Recurrent) and Axis III (Restless leg syndrome).  *Id.*  He recommended a follow-up appointment in two weeks.  *Id.*

At the subsequent follow-up visits, Rodriguez adjusted the dosage of his existing

---

[4] Rodriguez's progress notes are handwritten and difficult to read.  What is summarized here is what the court can reasonably discern.

[5] "There are five axes in the DSM diagnostic system, each relating to a different aspect of a mental disorder:

Axis I: This is the top-level diagnosis that usually represents the acute symptoms that need treatment; Axis I diagnoses are the most familiar and widely recognized (e.g., major depressive episode, schizophrenic episode, panic attack). Axis I terms are classified according to V-codes by the medical industry (primarily for billing and insurance purposes).

Axis II: This is the assessment of personality disorders and intellectual disabilities. These disorders are usually life-long problems that first arise in childhood.

Axis III: This is the listing of medical and neurological conditions that may influence a psychiatric problem. For example, diabetes might cause extreme fatigue, which may lead to a depressive episode.

Axis IV: This section identifies recent psychosocial stressors—the death of a loved one, divorce, loss of a job, etc.—that may affect the diagnosis, treatment, and prognosis of mental disorders.

Axis V: This section identifies the patient's level of function on a scale of 0–100, where 100 is the highest level of functioning. Known as the Global Assessment of Functioning ("GAF") Scale, it attempts to quantify a patient's ability to function in daily life."

*Cantu v. Colvin*, No. 5:13-CV-01621-RMW, 2015 WL 1062101, at *6 (N.D. Cal. Mar. 10, 2015); *see also* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed. 2000) ("DSM–IV") at 27-34.

medications and prescribed new medications, as needed, to address his anxiety and related symptoms.  *See* AR 337 (3/8/10 visit: decreasing Cymbalta dosage); 335 (4/5/10 visit: prescribing Gabapentin); 334 (4/20/10 visit: increasing Gabapentin dosage); 333 (5/4/10 visit: no change); 332 (6/29/10 visit: adjusting Cymbalta dosage); 331 (9/27/10 visit: no change, and last visit in the record).  His clinical diagnoses remained the same throughout his visits.

### b.    Marin Community Clinics (May 2012 - August 2014)

Redmond sought psychiatric/mental health treatment at Marin Community Clinics from March 2012 through August 2014.  He was seen by psychiatric nurse practitioner Aaron Miller from March 2012 through September 2013, and then by Dr. Julie Stahl from November 2013 through August 2014.

At the initial visit on March 21, 2012, Redmond presented with various conditions including insomnia, for which he sought a prescription refill.  AR 363-64.  He was referred for a psychiatric evaluation.  AR 364.

On May 9, 2012, Redmond underwent an initial psychiatric evaluation by Miller.  AR 528-31.  Redmond complained of sleep disturbances, and indicated that he had a history of depression, but denied any current symptoms of depression.  *Id.*  He also denied a past history of mania, and did not have current amotivation, problems organizing, or past psychiatric-related hospitalizations. *Id.*  During the exam, Redmond informed Miller that he had "received death threats in [the] past from politicians" regarding "overseas work related issues," but was not concerned about this.  AR 529.  Upon a mental status examination, Miller observed a number of normal findings.  AR 529. Specifically, Redmond's appearance was appropriate and he was oriented to person, time, place, and manner.  *Id.*  His behavior and psychomotor behaviors were unremarkable, and his affect was appropriate.  *Id.*  Notably, his attitude, reasoning, judgment, and impulse control were good, and his thought processes were logical.  *Id.*  He also did not express any suicidal or homicidal ideation. *Id.*  Miller clinically assessed Redmond with DSM ("Diagnostic and Statistical Manual of Mental Disorders") Axis I insomnia, Axis II sleep apnea, Axis III irritable bowel syndrome, and

migraines. AR 529. He also assigned Redmond a GAF[6] score of 78[7] under Axis V. *Id.*

From July 2012 through September 2013, Miller saw Redmond for regular follow-up visits on sleep disturbance and anxiety, and treated him with medications. During these visits, Miller conducted mental health status examinations which yielded normal findings, and assigned Redmond GAF scores of 75 to 81. AR 525 (7/11/12 visit: normal findings, GAF score of 81[8]); 522-23 (8/29/12 visit: normal findings, GAF score of 81); 517-19 (11/11/12 visit: normal findings, GAF score of 79); 511-13 (1/28/13 visit: normal findings, GAF score of 79); 508-10 (3/4/13 visit: normal findings, GAF score of 80); 504-05 (7/1/13 visit: normal findings, GAF score of 80); 500 (8/12/13 visit: normal findings, GAF score of 75); 496 (9/9/13 visit: normal findings, GAF score of 75, recommending follow-up with Stahl).

On November 1, 2013, Redmond saw Stahl, and reported that his depression symptoms were "severe" and occurring daily, but "fairly controlled." AR 492. He stated that he was depressed and stressed over his symptoms and the "lawsuit." *Id.* According to the screening tools administrated at this visit, Redmond's scores indicated moderate anxiety and moderate depression. *Id.* Upon a mental status examination, Stahl noted no signs of psychosis or mania, and made the same clinical assessments as had been noted on prior visits. *Id.* She assessed Redmond with a GAF score of 75, observed that Redmond was "relatively stable" on the current regimen, and recommended that he return to the clinic for a follow-up visit in 6 weeks. *Id.*

---

[6] "GAF" stands for Global Assessment of Functioning and assessed as part of Axis V of the DSM. It is a scale ranging from zero to 100 that is used to rate "psychological, social, and occupational functioning on a hypothetical continuum of mental-health illness." DSM–IV at 32. The Ninth Circuit has noted that while "GAF scores, standing alone, do not control determinations of whether a person's mental impairments rise to the level of a disability (or interact with physical impairments to create a disability), they may be a useful measurement." *Garrison v. Colvin*, 759 F.3d 995, 1003 (9th Cir. 2014).

[7] A GAF score of 71 to 80 indicates that "[i]f symptoms are present, they are transient and expectable reactions to psychological stressors (e.g., difficult concentrating after a family argument), no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)." DSM–IV at 34.

[8] A GAF score of 81 to 90 describes "absent or minimal symptoms (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns (e.g., an occasional argument with family members)." DSM–IV at 34.

10

1    Redmond saw Stahl for follow-up visits on anxiety and depression from December 2013 to

2    August 2014. During these visits, Stahl continued to report normal findings upon a mental status

3    examination, e.g., no signs of psychosis or mania, and assigned him GAF scores of 75. *See* AR

4    488 (12/13/13 visit: normal findings, GAF score of 75); 474 (3/28/14 visit: same); 419 (4/28/14

5    visit: same); 413 (6/26/14 visit: same); 407 (8/21/14 visit: same).

6    On August 21, 2014, Stahl saw Redmond for depression. AR 407. At this visit, Redmond

7    reported that his depression symptoms were moderate, occurring daily, but fairly controlled. *Id*.

8    He indicated that he was anxious and concerned about his physical health due to what he stated

9    was occurring in Washington, D.C. regarding his employment, and having been exposed to

10   harmful/lethal chemicals while working at Lawrence Livermore Laboratory. *Id*. He expressed

11   worry that he would die as a result of his exposure, as others have. *Id*. He also stated that he was

12   taking his medications as prescribed and that they were helpful. *Id.* Upon a mental status

13   examination, Stahl noted that no signs of psychosis or mania, and made the same assessments

14   were as on prior visits. *Id*. She continued to assess Redmond with a GAF score of 75; increased

15   Redmond's Fluoxetine dosage to improve his depression symptoms; continued other medications

16   as prescribed, and recommended a follow-up in 6 weeks. AR 407.

17   There are no other medical records for Marin Community Clinics.

18          c.    **Consulting Examining Psychologist Ute Kollath, Ph.D. (March
                  2014)**

19

20   On March 18, 2014, Kollath saw Redmond for a consultative mental status evaluation. AR

21   383-86. Redmond's chief complaints were toxic poisoning, depression, insomnia, memory

22   impairment, fatigue, migraines, and dizziness. AR 383. Kollath noted that Redmond presented in

23   a friendly and cooperative manner, made good eye contact, interacted appropriately with him and

24   the office staff throughout the evaluation, and did not exhibit bizarre behavior. *Id*.

25   In discussing his chief complaints, Redmond reported that he worked for a testing

26   laboratory, started experiencing symptoms of toxic poisoning in 2004, and was diagnosed with

27   toxic poisoning in 2006. *Id*. Although unclear, apparently sometime after he worked for the

28   testing laboratory, he worked as a research associate for Kaiser Permanente but was laid off in

2011 because he was unable to drive long distances due to increased fatigue.  AR 383.  He

represented that he was diagnosed with tremors, sleep impairment, depression, and "some lapses,"

had difficulty falling and staying asleep, and was fatigued during the day.  *Id*.  He indicated that he

used to be very active and had a successful career, but now had become increasingly depressed.

*Id*.  Regarding past psychiatric history, Kollath noted the absence of prior hospitalizations, prior

outpatient treatment, history of self-injurious behavior, or family history of mental illness, and that

Redmond's response and compliance with medications was fair.  AR 384.  Regarding

psychological history, Kollath indicated that Redmond reported having "physical limitations due

to medical problems."  *Id*.  However, he was independent for the basic activities of daily life, did

not need assistance with preparing meals, was able to drive, and make change at the store, and

typically spent his days reading.  *Id*.

      Upon a mental status examination, Kollath observed numerous normal findings including

that Redmond's judgment, insight, mood were intact and stable; his thought process was intact,

linear, and logical; he lacked suicidal ideation and denied having any hallucinations, paranoia, or

delusions; he exhibited no abnormalities in motor activity or speech, and his eye contact was

good; he was alert, fully oriented, and his intelligence and attention were fair.  AR 384.  However,

Kollath noted that Redmond's concentration was impaired based on the fact that he made an error

spelling a word in reverse.  AR 385.  Based on this data, Kollath concluded that Redmond was

cognitively unimpaired, and had no difficulty following simple and moderately complex

directions.  *Id*.  He indicated that Redmond's history and clinical presentation may be indicative of

a neurocognitive disorder.  *Id*.  Kollath also concluded that Redmond was functionally fair, but

emotionally impaired.  *Id*.  Kollath stated that Redmond's overall mental health prognosis was

"good with comprehensive mental health services."  *Id*.  Kollath thereafter assessed Redmond with

Axis 1 (311 Depressive Order NOS), Axis I (R/O 294.9 Cognitive Disorder NOS), Axis IV

(Problems related to: Medical and financial status), and an Axis V GAF score of 65.[9]  *Id*.

---

[9]  A GAF score of 61 to 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild
insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional
truancy, or theft within the household), but generally functioning pretty well, has some meaningful

Based on the mental health status examination, the interview with Redmond, and medical records, Kollath opined that Redmond was unimpaired in a number of work-related abilities including the ability to follow simple instructions, to follow complex/detailed instructions, to maintain adequate pace or persistence to perform one or two step simple repetitive tasks, to maintain adequate attention/concentration, to adapt to changes in job routine, to interact appropriate with co-workers, supervisors, and the public on a regular basis, to adopt to changes, hazards, or stressors in the workplace, and to manage his funds.  AR 386.  He opined that Redmond was mildly impaired in his ability to maintain adequate pace or persistence to perform complex tasks and to withstand the stress of a routine workday.  *Id.*

  **d.**  **State Agency Psychologist Evelyn Adamo, Ph.D. (April 2014)**

On April 4, 2014, Adamo conducted a medical evidence review and opined that Redmond did not have any restrictions in activities of daily life, and had mild difficulties in maintaining social functioning, concentration, persistence, or pace.  AR 74.

  **e.**  **State Agency Psychologist Richard Waranch, Ph.D. (June 2014)**

On June 13, 2014, Waranch completed a mental residual functional capacity assessment based on his review of the medical evidence.  AR 89-90.  Waranch opined that Redmond was moderately limited in his ability to understand and remember detailed instructions, but not significantly limited in his ability to remember locations and work-like procedures and understand and remember very short and simple instructions.  AR 89.

Waranch further opined that Redmond was moderately limited in his ability to carry out detailed instructions and maintain attention and concentration for extended periods.  However, Redmond was not significantly limited in his ability to carry out very short and simple instructions; perform activities with a schedule, maintain regular attendance, and be punctual within customary tolerance; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; make simple work-related decisions; and complete a normal workday and workweek without interruptions from

interpersonal relationships."  DSM-IV at 34.

psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. AR 89-90.

Waranch also opined that Redmond did not have any social interaction limitations, but had adaptation limitations. AR 90. Specifically, Redmond was moderately limited in his ability to respond appropriately to changes in the work setting. *Id.* However, he was not significantly limited in his ability to be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others. *Id.*

In conclusion, Waranch explained that Redmond was capable of understanding and remembering simple 2-3 step instructions, but would have difficulty understanding and remembering more detailed and complex instructions. *Id.* However, Redmond would be able to interact with the public, supervisors, and coworkers; be capable of completing a workday/workweek without interruption and work at a consistent pace; and be capable of adapting to changes and pressures in the workplace if the changes were infrequent and the pressure was not constant. *Id.*

### 2. Shoulder Impairment

#### a. San Francisco General Hospital (December 2011 - February 2012)

On December 12, 2011, Redmond went to the emergency room complaining of right shoulder pain that had gradually worsened over the past 2-3 weeks. AR 356-57. He indicated that he had a bilateral shoulder injury approximately 3-4 years ago that had lasted 1 week. AR 357. The treating provider assessed Redmond with right shoulder pain, adhesive capsulitis, and a possible rotator cuff tear and subacromial bursitis, and referred him to physical therapy. AR 357. Redmond was discharged the same day in good condition, with a referral for physical therapy and medications for the pain. *Id.*

On December 23, 2011, Redmond underwent a shoulder evaluation for physical therapy. AR 344. He complained of pain in his right shoulder and reported that he injured his right shoulder in 2009 on work equipment. *Id.* He indicated that the pain was so bad that he went to

the emergency room, and then was sent to urgent care, where he was given a cortisone injection in his right shoulder. AR 344. He indicated that the pain in the right shoulder ranged from 3 to 9 out of 10 on a scale of 1 to 10 for sharp, intermittent pain, and 1 to 4 out of 10 for intermittent aches. *Id.* Upon a physical examination, the examining physical therapist observed that Redmond had reduced range of motion in his right shoulder, experienced stiffness and soreness in his right shoulder, and had a positive Hawkins/Kennedy test result for possible shoulder impingement. AR 344-45. However, he exhibited 5/5 muscle strength in both shoulders. AR 344. Based on the initial examination, the physical therapist assessed Redmond with signs of right shoulder impingement stiffness and noted that he would benefit from physical therapy to address his impairments and functional limitations. AR 345.

Redmond was seen on February 7, 2012, and complained of right shoulder pain. AR 342. He rated the pain as 0 out of 10 in terms of intensity, but 8 out of 10 with activity, and described it as achy, shooting, and intermittent. *Id.* There are no other physical therapy records in the administrative record.

On February 9, 2012, X-rays of Redmond's right shoulder showed that the joint spaces were maintained and there were no fractures or dislocations. AR 353.

### b.   Consulting Examining Physician Manuel Hernandez, M.D. (February 2014)

On February 25, 2014, Hernandez saw Redmond for a consultative internal medicine evaluation. AR 377-80. Redmond's chief complaints were toxic poisoning, left shoulder pain, and back pain. AR 377.

Regarding toxic poisoning, Redmond explained to Hernandez that he worked for the U.S. Department of Energy since 2002, during which time he was involved in certain storage chemistry projects and handled over 20 exotic chemicals. *Id.* According to Redmond, the handling of these chemicals resulted in his chemical poisoning, and caused him to experience numerous symptoms including fatigue, migraines, insomnia, memory loss, ringing in the ears, kidney problems, choking at night while sleeping, disorientation, depression, neuromuscular issues, neurologic issues, and respiratory irritation. *Id.* Hernandez noted that there was no documentation for

15

Redmond's chemical exposure aside from what he told him, including the lack of a blood analysis for this type of exposure.   AR 377.

Regarding the left shoulder pain, Redmond stated that he was in a gym accident and hurt his left shoulder.  *Id.*  Redmond's complaints of left shoulder pain were documented.  *Id.* Specifically, the records showed that Redmond was seen from 2007 to 2012 for left shoulder pain, underwent cortisone injections and physical therapy, and was diagnosed with impingement syndrome and adhesive capsulitis in the left shoulder in 2007, but had a normal x-ray of the same shoulder, also in 2007.  AR 378.

Upon a physical examination, Hernandez observed that Redmond walked into the examination room without any difficulty, got on and off the examination table without any problems, and exhibited no ataxia or dyspnea.  *Id.*  Redmond's mental state was alert and cooperative; his affect was normal and he displayed normal attention and concentration.  *Id.* Regarding the shoulders, Hernandez noted that there were no joint deformities or heat, erythema or asymmetry, or tenderness; his ranges of motion (flexion, abduction, external and internal rotation) were all within normal limits; and there were negative Neer test and empty can test results.  AR 379.  As for the other upper extremities (elbows, wrists, and hands), and the lower extremities, Redmond exhibited all normal findings.  *Id.*  Regarding the neurological assessment, Redmond displayed strength of 5/5 in all extremities, a normal gait, and did not require an assistive device for ambulation, among other findings.  AR 379-80.

Based on the physical examination, Hernandez's impression was that although Redmond stated that he had a history of toxic exposure, he demonstrated no clinical signs of toxic exposure. AR 380.  Additionally, although he had a history of left shoulder pain dating back to 2007, he had full range of motion of his cervical and thoracolumbar spine; full range motion of all the weight-bearing joints, as well as all the muscles in his hands and feet; and full range of motion in both shoulder joints.  *Id.*  Hernandez diagnosed Redmond with a history of left shoulder pain and a history of chemical poisoning.  *Id.*

Based on the physical examination, testing, and observations of Redmond's spontaneous actions, Hernandez opined that Redmond had "no functional limitations with respect to lifting,

carrying, standing, walking or sitting positions." AR 380. Specifically, there were no push or pull limitations; postural limitations; manipulative limitations; limitations for climbing ramps, ladders or scaffolding; balancing; or visual, communicative or workplace environmental limitations. *Id.*

### c. State Agency Physician D. Pong, M.D. (March 2014)

On March 28, 2014, Pong conducted a medical records review and concluded that Redmond had no severe impairments. AR 72-73.

### d. State Agency Physician B. Sheehy, M.D. (June 2014)

On June 9, 2014, Sheehy conducted a medical records review and affirmed Pong's assessment. AR 85.

### e. Consulting Examining Physician Eugene McMillan, M.D. (December 2014)

On December 17, 2014, McMillan saw Redmond for a post-hearing internal medical evaluation. AR 430-33. Redmond's chief complaint was poisoning. AR 430. Regarding poisoning, Redmond reported that he worked as a contractor for the U.S. Department of Energy, during which time he handled chemicals; worked in buildings associated with Lawrence Livermore Laboratory from 2002 to 2010; and also worked at Rohnert Park, during which time he took materials home and worked on them. *Id.* Redmond indicated that he may have had testing for poisoning done at Kaiser Hospital, and told McMillan that he "should ask the Federal Government" in response to his question about the results of that testing. *Id.* McMillan noted that Redmond believed that his testing results had not been released because there was "potential for some sort of litigation." *Id.* Upon questioning, Redmond was unable to identify any specific heavy metals found in any of his hair or other samples. *Id.* He stated that he was currently experiencing symptoms related to chemical/toxic poisoning including dizziness, headaches, photophobia, nausea, hot flashes, cold flashes, insomnia, occasional tremors, fatigue in the afternoon and difficulty solving math problems. AR 431.

Upon a physical examination, McMillan observed, among other findings, that he had 25kg grip strength in both hands; ambulated without assistance; and had normal range of motion in the wrists, elbows, shoulders, hips, knees, and ankles and 5/5 strength in all those extremities. AR

433. Neurologically, McMillan noted normal findings.  *Id.*  McMillan's impression was a history of tension and migraine headaches.  *Id.*

McMillan assessed Redmond's functional capacity and opined that he would be able to occasionally lift and carry 100 pounds; frequently lift and carry 50 pounds; stand and walk for at least 6 hours during a 8-day hour day; and would be able to engage in activities that required stooping, kneeling, crouching, or crawling for more than 1/3rd of the workday.  *Id.*; *see generally* AR 424-29 (Medical Source Statement of Ability to Do Work-Related Activities (Physical) signed by McMillan on January 7, 2015 ("January 2015 Medical Source Statement")).  McMillan further opined that Redmond had no limitations on sitting; seeing, hearing or speaking; reaching in all directions; gross or fine manipulation; or any environmental limitations for heights, moving machinery, temperatures, chemicals or dust.  AR 433; *see generally* January 2015 Medical Source Statement.

### E.    The ALJ's Decision

The ALJ performed the five-step disability analysis and found Redmond was not disabled. AR 11-26.  At the second step, the ALJ determined that Redmond had the following severe impairments: status-post chemical exposure and affective disorders (26 C.F.R. § 416.920(c)).  AR 17.  At Step 3, the ALJ found that the affective disorder impairment did not meet or equal Listing 12.04, *see* 20 C.F.R. § Pt. 404, Subpt. P, App. 1.  AR 19.  The ALJ then determined that Redmond had the following residual functional capacity (RFC): he had the capacity to perform medium work, as defined in 20 C.F.R. § 416.967(c)[10], and was able to perform at least simple, repetitive tasks, equating to unskilled work.  AR 21.  The ALJ found that Redmond was unable to perform any past relevant work, but concluded that there were jobs that he could perform with such an RFC.  AR 25.  The ALJ concluded that Medical-Vocational Guideline Rule 203.15 directed a finding of non-disability and found Redmond was not disabled.[11]  *Id.*

---

[10] 20 C.F.R. § 416.967(c) defines "medium work" as "involv[ing] lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."  "If someone can do medium work, [the ALJ] determine[s] that he or she can also do sedentary and light work."  *Id.*

[11] The Medical–Vocational Guidelines are a matrix system for handling claims that involve substantially uniform levels of impairment.  *See* 20 C.F.R. Part 404, Subpt. P, App. 2. They are

## V.     STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), the court has the authority to review a decision by the Commissioner denying a claimant disability benefits.  "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).  Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It is more than a mere scintilla, but less than a preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir.1996) (internal citation omitted).  When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citation and quotation marks omitted).

If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted).  "Finally, the court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

## VI.     DISCUSSION

### A.     ALJ's Duty to Develop the Record

Redmond argues that the ALJ erred in failing to fully develop the record on his mental health impairments.  According to Redmond, the ALJ should have ordered him to undergo a mental health examination or obtain additional testimony from a mental health expert because he clearly exhibited signs of delusional behavior at the hearing and there was no record evidence to support certain aspects of his claim for toxic poisoning from chemical exposure.

The Commissioner makes two arguments in response: 1) Redmond waived this issue on

commonly referred to as "the grids."

appeal because neither he nor his counsel raised it before the ALJ at the administrative hearing, and 2) even if he did not waive this issue, the ALJ had no duty to develop the record further because the record was neither inadequate nor ambiguous regarding his mental impairments.

Because the Commissioner's waiver argument is potentially dispositive, the court will address it first.

### 1. Waiver

In *Meanel v. Apfel*, 172 F.3d 1111, 1115 (9th Cir. 1999), as amended (June 22, 1999), the Ninth Circuit "h[e]ld that at least when claimants are represented by counsel, they must raise all issues and evidence at their administrative hearings in order to preserve them on appeal," otherwise those issues are deemed waived. *See also Shaibi v. Berryhill*, 883 F.3d 1102, 1109 (9th Cir. 2017)[12] (relying on *Meanel* and holding that "when a claimant fails entirely to challenge a vocational expert's job numbers during administrative proceedings before the agency, the claimant forfeits such a challenge on appeal, at least when that claimant is represented by counsel"). Courts should only "excuse a failure to comply with [the waiver] rule when necessary to avoid a manifest injustice." *Meanel*, 172 F.3d at 1115.

According to the Commissioner, Redmond waived the issue of whether the ALJ failed to fully develop the record regarding his mental health impairments because his counsel did not indicate that there was any need to develop the record in this regard. Nor did counsel suggest that Redmond's claim for toxic poisoning was a product of his delusions.

Redmond disagrees. Although not entirely clear, he appears to argue that the issue of whether the ALJ failed to develop the record cannot be waived because the ALJ has an independent duty to develop the record, particularly where the claimant may be mentally ill. He contends that *Meanel* and *Shaibi* should be read narrowly as limited to their facts, since they do not address a claimant's potential mental health issues, and thus do not stand for the proposition

---

[12] The parties both cite to *Shaibi v. Berryhill*, 870 F.3d 874, 876 (9th Cir. 2017). This opinion was amended and superseded on denial of a petition for rehearing en banc by *Shaibi v. Berryhill*, 883 F.3d 1102 (9th Cir. 2017). 883 F.3d at 1103 ("The opinion filed on August 22, 2017, and published at 870 F.3d 874, is hereby amended."). The court will therefore cite to the amended opinion.

1  that a claimant can waive the right to challenge an ALJ's failure to develop the record with respect
2  to such issues.

3        Having carefully reviewed the record, the court finds that Redmond has waived the right to
4  appeal the issue of whether the ALJ failed to fully develop the record regarding his mental health
5  impairments. *Meanel*, 172 F.3d at 1115. The record demonstrates that counsel had ample
6  opportunity to raise arguments about Redmond's mental health, or to call into question the basis
7  for Redmond's claim that he was suffering from toxic poisoning. Prior to the hearing, Redmond's
8  counsel had access to the information that he now cites to argue that Redmond's belief that he was
9  exposed to chemicals while working at the U.S. Department of Energy may be fictional, and may
10  be the result of mental illness. For example, Redmond stated in an SSA Work History Report that
11  he worked for the U.S. Department of Energy as an executive vice president starting in November
12  2002 and earned an annual salary of $180,000. *See* AR 237, 240 (Work History Report).
13  However, his certified employment records show no earnings for 2002-2004, no employment by
14  the U.S. Department of Energy, and no earnings approximating this annual salary. AR 183, 187.
15  In another pre-hearing document, Redmond made statements that he was the subject of targeted
16  attacks by the U.S. Department of Energy, AR 556, and had received nearly 100 commendations
17  including congressional commendations. AR 554. His counsel was in the best position to analyze
18  the evidence and raise any concern about Redmond's mental health before the ALJ.

19        Moreover, although Redmond discussed the facts underlying the toxic poisoning claim at
20  least twice at the hearing, his counsel did not indicate that Redmond was mistaken, or that his
21  testimony was evidence of mental illness. Redmond testified that he felt terrified because he
22  received death threats for giving testimony before federal agencies about his exposure to
23  chemicals while working for the U.S. Department of Energy, and that one of his associates who
24  had also claimed toxic poisoning was dead. AR 52. In response to questions from the VE, he
25  discussed working at the U.S. Department of Energy and his exposure to chemicals during that
26  time. AR 61-62. At no point did Redmond's counsel challenge these factual assertions, or
27  suggest in any way that there was need for further record development on Redmond's mental
28  impairments in light of allegedly delusional statements.

1    Even if counsel failed to appreciate at the hearing that Redmond's testimony may have

2    demonstrated delusional thinking, counsel could have alerted the ALJ to any issue after the

3    hearing.  The ALJ held the record open for at least two months following the hearing to receive

4    additional medical evidence prior to the issuance of his decision.  AR 327-29, 424-33.

5    In viewing the record as a whole, the court is not surprised that Redmond's testimony did

6    not alert the ALJ to the possibility that he may be suffering from delusional thinking.  The record

7    shows that Redmond saw mental health professionals regularly in 2010 (Rodriguez), and from

8    2012 to 2014 (Miller and Stahl).  All of these providers consistently observed normal findings

9    upon routine mental health status examinations.  *See, e.g.,* AR 331-37, 40 (Rodriguez); 496, 500,

10   504-05, 511-13, 517-19, 522-23, 525, 528-31 (Miller); 407, 413, 419, 474, 488, 492 (Stahl).

11   When Redmond relayed the same or similar statements to Miller and Stahl during his May 9, 2012

12   and August 24, 2014 visits, they made no findings that he was possibly delusional.  For example,

13   during the May 9, 2012 visit, Redmond told Miller that he had "received death threats in [the] past

14   from politicians" regarding "overseas work related issues."  AR 529.  Upon a mental status

15   examination, Miller observed no abnormal findings, and assigned him a GAF score of 78, which

16   indicates that "[i]f symptoms are present, they are transient and expectable reactions to

17   psychological stressors (e.g., difficult concentrating after a family argument), no more than slight

18   impairment in social, occupational, or school functioning (e.g., temporarily falling behind in

19   schoolwork)." DSM–IV at 34.  Additionally, at the August 21, 2014 visit, Redmond indicated to

20   Stahl that he was anxious and concerned about his physical health due to what was occurring in

21   Washington, D.C. regarding his employment, and having been exposed to harmful/lethal

22   chemicals while working at Lawrence Livermore Laboratory.  AR 407.  Upon a mental status

23   examination, Stahl noted that no signs of psychosis or mania.  *Id.*  In fact, the entire medical

24   record shows normal mental health examinations and no findings of anything indicative of

25   delusional thinking.

26   Redmond does not point to any case or circumstance that might excuse his or his counsel's

27   failure to raise this issue below.  He does not cite any case to support his assertion that a claimant

28   cannot waive the issue of whether an ALJ failed to properly develop the record with respect to a

claimant's mental health. Nothing in *Meanel* suggests that its holding is limited as Redmond suggests. Courts in this circuit have applied *Meanel* in a variety of factual contexts, including the waiver of an argument that the mental health record should have been developed further by the ALJ. *See, e.g.*, *Johnson v. Colvin*, No. ED CV 15-02239 AFM, 2016 WL 4208434, at *3 (C.D. Cal. Aug. 8, 2016) (relying on *Meanel*, and holding that "neither Plaintiff nor his counsel suggested that the ALJ . . . should send Plaintiff to a mental evaluation, or should further develop the record in any other way. As such, Plaintiff waived any arguments on [this issue]."); *Gould v. Colvin*, No. 6:14-CV-02055-JE, 2016 WL 7362792, at *6 (D. Or. Dec. 19, 2016) (relying on *Meanel*, court found that claimant waived her argument that the ALJ failed to adequately develop the record regarding her need to use a cane for balance by failing to raise it during the administrative hearing). In *Shaibi*, the Ninth Circuit applied the principles in *Meanel* and held that the claimant had waived his right to appeal the issue of the ALJ's alleged improper reliance on the VE's job numbers by failing to challenge the VE's job numbers during the administrative proceedings. 883 F.3d at 1108-09.

Since the court finds that Redmond has waived the right to challenge the ALJ's alleged failure to fully develop the mental health record, it does not reach the merits of this issue.

### B.    The ALJ's Evaluation at Step 5

Redmond argues that the ALJ erred at Step 5 in the sequential evaluation. At step five, the Commissioner bears the burden "to show that the claimant can perform some other work that exists in 'significant numbers' in the national economy, taking into consideration the claimant's [RFC], age, education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999) (quoting 20 C.F.R. § 404.1560(b)(3)); *see also Lockwood v. Comm'r of Soc. Sec. Admin.*, 616 F.3d 1068, 1071 (9th Cir. 2010) (where claimant establishes that she suffers from a severe impairment that prevents her from doing past work, burden shifts to the Commissioner to show that she can perform some other work). The Commissioner can meet this burden in two ways: "(1) by the testimony of a vocational expert, or (2) by reference to the Medical-Vocational Guidelines [or "grids"] at 20 C.F.R. pt. 404, subpt. P, app. 2."; *Tackett*, 180 F.3d at 1099.

Where, as here, a claimant suffers from both exertional and non-exertional limitations, the

grids "provide a framework to guide the ALJ's decision." 20 C.F.R. § 404.1569a(d). In such situations, the ALJ must consult the grids first. *Lounsburry v. Barnhart*, 468 F.3d 1111, 1115 (9th Cir. 2006). "If the claimant is 'disabled' under the grids, there is no need to examine the effect of the non-exertional limitations. But if the same person is not disabled under the grids, the non-exertional limitations must be examined separately." *Id*. at 1116. The ALJ should "determine if a claimant's non-exertional limitations significantly limit the range of work permitted by his exertional limitations." *Desrosiers v. Sec'y of Health & Human Servs*., 846 F.2d 573, 577 (9th Cir. 1988); *see also* SSR 83–12 (noting that the ALJ is required to "consider the extent of any erosion of the occupational base and access [sic] its significance."). A VE's testimony "is required when a non-exertional limitation is 'sufficiently severe' so as to significantly limit the range of work permitted by the claimant's exertional limitation." *Hoopai v. Astrue*, 499 F.3d 1071, 1076 (9th Cir. 2007) (quoting *Burkhart v. Bowen*, 856 F.2d 1335, 1340 (9th Cir. 1988)).

Here, the ALJ found that Redmond suffered from exertional and non-exertional limitations. The ALJ determined that Redmond had the RFC to perform medium work as defined in 20 C.F.R. § 416.967(c). AR 21. Additionally, the ALJ observed that Redmond suffered from non-exertional limitations, such as intermittently impaired concentration, and persistent depression and anxiety, and accordingly limited him to simple, repetitive tasks, equating to unskilled work. AR 24.

The ALJ then concluded that Redmond was unable to perform any of his past relevant work as a business development manager, a working construction superintendent, a consultant, a vice president, and an office manager, because all of these jobs are skilled in nature, and Redmond was limited to unskilled work. AR 25. The ALJ next found that Plaintiff was born on April 11, 1955 and qualified as an individual of advanced age by his April 4, 2010 alleged onset date. *Id*. (citing 20 C.F.R. § 416.963). The ALJ also determined that Redmond had a college education and was able to communicate in English. *Id*.

Based on these facts, the ALJ held that Redmond's case was controlled by grid Rule 203-15. Medical–Vocational Guidelines, 20 C.F.R. Part 404, Subpt. P, App. 2. *Id*. The ALJ concluded that "[w]ith the residual functional capacity to perform the full range of medium work,

considering the claimant's age, education, and work experience, Medical-Vocational Rule 203.15 direct[ed] a finding of 'not disabled." AR 25. The ALJ also found that "[w]hile nonexertional limitations compromise[d] [Redmond's] ability to perform work at the medium exertional level, these limitations [did] not erode the medium unskilled occupational base, as all such jobs administratively noticed by the Medical-Vocational Guidelines at 20 CFR, Part 404, Subpart P, Appendix 2, [were] unskilled." *Id.*

Redmond contends that the ALJ erred at Step 5 by 1) finding that he could perform medium work, and 2) failing to account for his shoulder impairments in the RFC, including failing to ask the VE about the effect of his shoulder limitations, pain, or fatigue on his ability to perform a full range of medium work. Neither argument is persuasive.

There is substantial evidence to support the ALJ's finding that Redmond could perform a full range of medium work. For example, in the February 25, 2014 physical examination, Redmond exhibited normal range of motion in all directions in his upper extremities (including his shoulders), and his lower extremities; and displayed 5/5 strength in all extremities. AR 379-80. Accordingly, Hernandez opined that Redmond had "no functional limitations with respect to lifting, carrying, standing, walking or sitting positions." AR 380. On March 28, 2014, Pong conducted a medical records review and concluded that Redmond had no severe impairments. AR 72-73. Sheehy affirmed Pong's assessment on June 9, 2014. AR 85. Additionally, on December 17, 2014, McMillan found that Redmond had 25kg grip strength in both hands; a normal range of motion in the shoulders, wrists, elbows, hips, knees, and ankles; and 5/5 strength in all his extremities. AR 433. McMillan opined that Redmond would be able to occasionally lift and carry 100 pounds and frequently lift and carry 50 pounds, which is defined as heavy work[13]; engage in activities that required stopping, kneeling, crouching or crawling for more than 1/3rd of the workday; and had no limitations in sitting, or reaching in all directions. AR 424, 433. No medical evidence supports that Redmond could only perform less than medium work, and Redmond points

_____

[13] 20 C.F.R. § 416.967 (d) defines "Heavy work" as "involv[ing] lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds."

United States District Court
Northern District of California

to none in his briefing.

Even though these medical opinions support the ability to perform more than medium work, the ALJ discounted the opinions and found that Redmond's RFC should be restricted to medium work. AR 23-24. The ALJ explained that he gave limited weight to McMillan's opinion because he found that Redmond's allegations of difficulties with heavy or repetitive lifting were credible, and McMillan had not reviewed any medical records in connection with his assessment, and failed to provide any explanations to substantiate his conclusions regarding Redmond's functional abilities. *Id.* The ALJ discounted Hernandez's opinion for the same reasons. AR 23 (noting that Hernandez did not review any medical records in connection with his assessments, did not support his assessment with a specific rationale, and his opinion was inconsistent with the medical evidence as a whole that supported a determination that Redmond would have some lifting and carrying limitations). The ALJ similarly gave "little weight" to the opinions of Pong and Sheehy, because they did not give adequate consideration to Redmond's "credible reports of recurring fatigue." AR 24. As Redmond does not challenge any of these findings, the court cannot find that the ALJ erred in finding that he could perform a full range of medium work.

Instead, Redmond argues that the ALJ should not have interpreted his statements s about "difficulty with heavy or repetitive lifting" to mean that he nevertheless was fully capable of medium work. AR 23. To the extent that the ALJ interpreted this to mean that Redmond was capable of medium but not heavy work, his interpretation was reasonable and also supported by substantial evidence in the record as discussed above. It is therefore entitled to deference.

As to Redmond's contention that the ALJ erred in his assessment of his shoulder impairment, Redmond first challenges the ALJ's finding that his shoulder impairments were non-severe. However, there is substantial evidence to support this finding. AR 18. The record shows that Redmond went to the emergency room on December 12, 2011 complaining of right shoulder pain that had gradually worsened over the past 2-3 weeks. AR 356-57. On December 23, 2011, Redmond indicated that the pain in the right shoulder ranged from 3 to 9 out of 10 on a scale of 1 to 10 for sharp, intermittent pain, and 1 to 4 out of 10 for intermittent aches. AR 344. Upon a physical examination, Redmond exhibited reduced range of motion in his right shoulder, stiffness

and soreness, and a positive Hawkins/Kennedy test result for possible shoulder impingement. AR 344-45. However, a right shoulder x-ray taken on February 9, 2012 showed that the joint spaces were maintained and there were no fractures or dislocations. AR 353. Three months later, on May 2, 2012, Redmond reported only occasional shoulder pain. AR 366. There is no record of any shoulder-related treatment after 2012. The next time he underwent a shoulder evaluation was on February 25, 2014. On February 24, 2014, upon a physical examination, Hernandez observed that there were no joint deformities or heat, erythema or asymmetry, or tenderness in Redmond's shoulders; the ranges of motion (flexion, abduction, external and internal rotation) in the shoulders were all within normal limits; and he had negative Neer test and empty can test results. AR 379. Hernandez also noted that Redmond displayed strength of 5/5 in all extremities. AR 379. Similarly, at the December 17, 2014 physical examination, McMillan noted that Redmond exhibited a normal range of motion in the shoulders and 5/5 strength in his upper extremities. AR 43.

Redmond contends that the ALJ should not have interpreted the lack of evidence of treatment after 2012 to mean that his shoulder impairments were not significant. According to Redmond, the lack of treatment in that time period can be explained by the fact that he stopped working by 2012 and thus "was not engaged in the type of lifting/carrying required for the full range of medium work." Redmond asserts that when he was working, his shoulder symptoms were more significant. *See* AR 242 (Work History Report-showing that he could lift at most 10 pounds and frequently lifted 25 pounds while working as an officer manager); 345 (12/23/11 San Francisco General Hospital Physical Therapy Shoulder Evaluation); 357 (12/12/11 Urgent Care Treatment Note); 366 (Note from 5/2/12 office visit where he reported "occasional shoulder pain"). The fact that the evidence may be subject to a different interpretation, however, is not a basis for error. Where the evidence is subject to different interpretations, the court cannot substitute its judgment for that of the ALJ. *See Jamerson*, 112 F.3d at 1066. In any event, the February and December 2014 physical exams discussed above indicated that Redmond had a normal range of motion in his shoulders and full strength in his upper extremities.

Redmond next argues that it is unclear how the ALJ factored his shoulder impairments into

1  formulating the RFC because the lifting limitations were attributed to spine impairments and

2  fatigue.  This argument is unpersuasive.  No provider determined that Redmond had lifting

3  limitations due to his shoulders.  The only supporting evidence that Redmond identifies is his own

4  testimony.[14]  Even assuming the ALJ did not clearly factor shoulder impairments into formulating

5  the RFC, the error is harmless.  Redmond has not explained how the inclusion of the shoulder

6  impairments would have impacted the RFC, which already accounts for lifting limitations.  To the

7  extent that Redmond suggests that there may be different lifting limitations associated with

8  shoulder impairments, he has failed to provide any evidence to support that point.

9       Redmond also contends that the ALJ erred in failing to obtain testimony from the VE on

10  medium jobs requiring less than a full range of medium work.  According to Redmond, the ALJ

11  was required to ask the VE to consider his ability to perform medium jobs given his limitations in

12  reaching related to his shoulders, and his reduced ability to lift/carry and stand/walk due to pain

13  and frequent fatigue.  However, as discussed above, there is no medical evidence to support

14  Redmond's contention that he could not perform a full range of medium unskilled work.

15  Furthermore, Redmond does not explain how the RFC's limitation to medium work fails to

16  address his lifting limitations and reduced ability to lift/carry and stand/walk.  Additionally, since

17  the ALJ concluded that Redmond was not disabled under Rule 203-15 of the Medical–Vocational

18  Guidelines, and none of his non-exertional limitations were severe, the ALJ did not need the VE's

19  opinion on medium jobs requiring less than full range of medium work.  *See Hoopai*, 499 F.3d at

20  1076 (A VE's testimony "is required when a non-exertional limitation is sufficiently severe so as

21  to significantly limit the range of work permitted by the claimant's exertional limitation").

22       Therefore, the ALJ did not err at Step 5.

23  //

24  //

25  //

26

27  ───────────────
    [14] Redmond testified that his right shoulder bothered him more than the left shoulder; that if he
28  lifted his right shoulder too high, or too low, or held it in one position for a long time, he would
    experience pain; and that he had to limit his time typing.  AR 55.

## VII.  CONCLUSION

In conclusion, the court grants the Commissioner's cross-motion and denies Redmond's motion.

**IT IS SO ORDERED.**

Dated: July 2, 2018



Donna M. Ryu
United States Magistrate Judge